HANSON *et al. v*. DAVIS, DIRECTOR GENERAL OF RAILROADS.

[95 South. 787. No. 23177.]

1. CONTRACTS. *Where grantee in sales contract agrees as part consideration to pay debts due by grantor, creditors of seller may sue grantee directly.*

Where a grantee in a contract of sale agrees, as a part of the consideration for his purchase, to pay the debts due by the grantor, accrued and to accrue, and enters into possession under such agreement, the creditors of the seller may sue the grantee directly on such undertaking, and may recover personal judgment against him. This is especially true if the grantee acts for his vendor in contracting such debts. *Barnes* v. *Jones*, 111 Miss. 337, 71 So. 573; *Dodge* v. *Cutrer*, 100 Miss. 647, 56 So. 455, cited.

2. WILLS. *Devisee coming into possession of property without notice to creditors held trustee of the trust created by will and personally liable for payment of testator's debts.*

Where a testator directs in his will that all his just debts be paid, and makes his wife sole devisee and executor without bond, and provides that his wife shall have "full authority, . . . full possession of all the estate of every character, . . . and after taking out letters testamentary upon my estate, she shall thereafter be relieved from making any inventory, any appraisement giving bond, making annual reports or conforming to any other legal provisions, . . . and . . . shall have absolute right to dispose of any property, . . . without obtaining any order from any court whatsoever, . . . subject to the payment of indebtedness and without subsequent direction by any

132 Miss.—6

court," and where the devisee comes into possession of the prop-
erty without publishing notice to creditors, etc., she is a trustee
and the will creates a trust for the payment of debts, and she is
personally liable.

APPEAL from chancery court of Lauderdale county.

HON. G. C. TANN, Chancellor.

Suit by James C. Davis, Director General of Railroads,
against C. C. Hanson and others. Demurrer to the bill
was overruled, and defendants appeal. Affirmed and re-
manded.

*Jacobson & Brooks* and *Green & Green,* for appellant.

The bill seeks recovery against Hanson on the allega-
tion that he assumed the payment of this debt of A. F.
Churchill and hence his is a primary debt. This proceeds
upon the idea that there is an indebtedness existing; but
in order to have an indebtedness existing of the principal
A. F. Churchill for him to assume, there must be a probate
of the will and a probate of the indebtedness, for, unless
there is an indebtedness of A. F. Churchill existing there
could be no liability of Hanson for its payment.

The only recital in the record as to any assumption by
Hanson of any debt of Churchill is that contained in the
power of attorney from Mrs. Lois Churchill, individually
and as executrix, to C. C. Hanson to conduct the business
on behalf of Mrs. Churchill. And this recital in this power
of attorney was dated June 24, 1920, and it recites that
on or about June 2, 1919, Churchill had sold, or agreed
to sell, the compress to Hanson.

This power of attorney is not signed by Hanson and
there is no evidence in writing of the assumption by Han-
son of this indebtedness or the terms of the assumption,
except that recited in the *ex parte* power of attorney of
Mrs. Lois Churchill, and this made after the death of A. F.
Churchill and for the purpose of authorizing a conduct
of the business of the compresses by Hanson for Mrs.
Churchill's own account.

Where a deed recited the assumption of the payment of an encumbrance by the grantee, it was held in *Lee* v. *Newman,* 55 Miss. 371, that there could be no decree *in personam* against the grantee, and that recourse was confined to the property conveyed for the satisfaction of the indebtedness.

This is the proposition here, for the power of attorney of Mrs. Churchill expressly recites that the compresses in the several states have been sold, or agreed to be sold, to Hanson for a certain amount of money and the assumption of the cost of the purchase and operation; but expressly provides that they are to be paid by a sale of the compresses, and, as shown in our original brief, under the rule in *Pool* v. *Doster,* 59 Miss. —, there could be no recovery by A. F. Churchill's creditors against Hanson personally unless and until it was shown that the compresses had been sold and that Hanson had realized the money from the sale thereof to make the payment.

*Baskin & Wilbourn,* for appellee.

The facts set forth in the bill and in the exhibits, we submit, abundantly justify the charge in the bill that C. C. Hanson was liable for these indebtednesses because of his agreement with the said Churchill to pay them. We do not see how the court could hold as a matter of law on Hanson's separate demurrer that Hanson was not liable, where his demurrer admits the allegations of this bill, and that he is conducting the compress business at Meridian in the name of the Churchill Compresses and admits that he had the character of agreement that has been set out in the bill and exhibits.

Grantee who as part of the consideration for a deed to him assumes the payment of the grantor's debt to his vendor, becomes personally liable to the vendor, who may recover the amount of the debt. *Barnes* v. *Jones,* 111 Miss. 337, 71 So. 573; *Dodge* v. *Cutrer,* 100 Miss. 647, 56 So. 455.

The principles announced in this case are applicable to the facts set up in the bill and exhibits of the case at bar. Hanson having bought the property upon an agreement to pay Churchill's debts accrued and to accrue, in the operation of the property, and the bill averring and showing and the demurrer necessarily admitting that the debts sued for are of the class of debts which Hanson assumed and agreed to pay for Churchill, it seems to us clear that the director general has the undoubted right to proceed directly against Hanson for the recovery of the debt.

On June 2, 1919, Hanson was the purchaser of the properties from Churchill and from and after that date he was the one operating them, but by virtue of the peculiar terms of the contract between him and Churchill until he should have fully paid for the property, he was operating it in the name of Churchill, with the agreement that he would assume and pay the debts and liabilities accruing and to accrue in that operation. We fail to see the pertinency or force of the suggestion of counsel for appellant that Mr. Hanson would not become liable to the creditors of Churchill individually as the purchaser of the property until he had paid therefor the price.

If we rightly understand the case of *Barnes* v. *Jones,* *supra,* Hanson became liable to the creditors of Churchill, whose debts he had assumed, and they could sue him and were not required to sue either Churchill or his estate, but could go directly against Hanson.

Now we further submit that counsel are mistaken in construing the contract whereby Hanson agreed to pay the debts and liabilities of Churchill as not an absolute contract to pay in any event. Counsel seems to think in their brief that Hanson was only to pay Churchill out of the proceeds of a resale of the property by Hanson. It seems to us that the contract provided for a definite money consideration not to Churchill in addition to the assumption by Hanson of the debts and liabilities accrued or to accrue. The assumption of the debts by Hanson is clearly made absolute.

The case of *Pool* v. *Doster,* 59 Miss. 258, is, we submit, wholly inapplicable to the facts of the case before the court. There the principal debtor had a surety. The principal debtor gave his surety security as a personal indemnity to him against any loss. The creditor of the principal debtor could not go against the security given to the surety to indemnify the surety against personal loss. That was because the only way to reach the security given to indemnify the surety against personal loss would be according to the terms of the instrument and through the surety in the event he sustained a loss. But there is no such situation in the case at bar. We are not after any securities given to any surety to indemnify him against personal loss, and Hanson did not become a mere surety for Churchill on Churchill's debts accruing in the operation of the compress. Hanson simply bought the property and agreed to pay Churchill for the property in part by paying certain debts that Churchill already had incurred in the operation of the plant and thereafter to pay any others that might be incurred in the operation of the plant, and took charge of the plant and operated it in Churchill's name, according to the agreement. It seems to us that there is no ground for the theory that Hanson was a surety of Churchill and that *Pool* v. *Doster, supra,* is inapplicable.

Nor do we think counsel for appellant Hanson are correct in their argument that until and unless Hanson has sold the compress properties for a sufficiency to pay the debts agreed to be paid by him there could be no cause of action in Churchill's creditors to pay their debts. It was not essential that Hanson would pay the debts only out of the proceeds of the resale of the property. He expressly agreed to pay the debts growing out of the purchase and operation of the compress, and the agreement is absolute and not contingent upon anything.

Counsel cite as sustaining their contention, *Bernheim* v. *Beer,* 56 Miss. 149; and *Smith* v. *Ratliff,* 66 Miss. 686, but it seems to us that those cases are wholly inapplicable to the point now before the court. The question here is

what is a debt or a liability accrued or to accrue, growing
out of the purchase and operation of the said compresses
and ginning plants.   And if Churchill in the operation
of the compresses had a contract with the director general,
as was alleged and shown in the bill and exhibits, under
the terms of which he became liable to the director general
for the insurance premiums specified in the terms of the
compression contract, it seems to us that the point is set-
tled in favor of our contention.   Indeed it was and is set-
tled by the acts of the parties themselves and their solemn
contract whereby they expressly made this particular in-
surance question a part of the operating expenses and one
of the express terms of their contract.   We will not, there-
fore, undertake to follow counsel in their right.   Point 4
in their brief about the meaning of the word "operation,"
as we are dealing with a liability or a debt that grew out
of an express contract made in the process of operating
the compresses and touching the very vital part of the
business of operating the compresses.

It seems to us therefore that Hanson is certainly liable
to the complainant for the debts here sued for and that his
demurrer ought to be overruled.


ETHRIDGE, J., delivered the opinion of the court.

The appellee, James C. Davis, Director General, operat-
ing the Mobile & Ohio Railroad, filed an attachment in
chancery, in the chancery court of Lauderdale county,
Miss., against the appellant C. C. Hanson, trading as the
Churchill Compresses, and Mrs. Lois Churchill, and the
Fidelity & Deposit Company, and J. D. Morton, Jr., al-
leging that the defendant Hanson was trading as Churchill
Compresses and was operating thereunder certain com-
presses at Meridian, Miss., Tupelo, Miss., and Corinth,
Miss., and is a nonresident of the state of Mississippi, re-
siding in the state of Tennessee, that the defendant Mrs.
Lois Churchill is a nonresident of the state of Mississippi,

and lives in the state of Georgia, and that J. D. Morton is a resident of Lauderdale county, Miss., in charge of the compress operated by Hanson at Meridian, Miss., and had in his custody and under his control property belonging to the defendants Hanson and Mrs. Lois Churchill, or in which they have some interest.

It is further alleged that A. F. Churchill, now deceased, was the former owner of the compress properties and of various compresses in the states of Alabama, Arkansas, Mississippi, Missouri and Tennessee, and that he was compressing cotton for hire, and storing cotton for hire in the state of Mississippi, and owned and operated cotton compresses in the said state; that, beginning in September, 1917, said A. F. Churchill entered into a contract with the Mobile & Ohio Railroad Company, which contract was later renewed and extended between said Churchill and the director general of railroads on the 23d day of September, 1918, and again on the 1st day of September, 1919, copies of which contracts are made exhibits to the bill; that the performance of said contracts by the said Churchill was secured by bond executed by the appellant Fidelity & Deposit Company of Maryland, as surety, a copy of which is made an exhibit to the bill. Under the contract between said Churchill and the director general, the performance of which was secured by the Fidelity & Deposit Company of Maryland, it was provided, with reference to demurrage charges that should accrue in favor of the railroad company, or the director general operating the railroads, that certain sums should be paid by the compress for each day or fractional part of a day that cars were delayed or held after the first forty-eight hours, and for certain credits with reference to such contracts not necessary specifically to be set forth in this opinion. The contracts also provided for unloading cotton in transit and compressing it and reloading for shipment, and for receiving and compressing cotton which would be consigned over the Mobile & Ohio Railroad for shipment, and for insurance of said cotton, etc. These settlements were to

be made from weekly or monthly bills, and all sums disbursed by the railroad company for premiums for insurance, provided that the average rate of premium for the year or for the season, paid by the railroad at the said compress, shall not exceed the average rate obtainable by the compress at that point, and shall be based on monthly averages, detention time. The bill set forth various extensions of said contract and an indebtedness for the insurance premiums and for the items of demurrage.

It is alleged that Churchill conducted the business in the name of the Churchill Compress originally, and that on the 20th day of August, 1917, he gave to Hanson a power of attorney, which is set forth as an exhibit to the bill, under the terms of which Hanson was authorized to manage, operate, and control the compresses in the states of Alabama, Arkansas, Mississippi, and Tennessee. The authority given in the contract between Hanson and Churchill was full and explicit, and authorized Hanson to carry on the business, pay the debts and expenses, sell the property, etc. There was an extended additional power of attorney given on the 19th day of June, 1919, and a contract had been made between Hanson and Churchill, whereby Churchill agreed to sell and did sell to said Hanson all his compresses and ginning property, etc., and also all bills receivable, choses in action, and all other assets of every kind and character belonging to the said Churchill, growing out of or accruing from the purchase and operation of the Churchill Compresses and gins in the states of Alabama, Arkansas, and Mississippi, for a consideration of five hundred and fifty thousand dollars, plus certain items in the nature of advances aggregating twenty-four thousand eight hundred sixty-two dollars and eighty-seven cents, making a total consideration of five hundred seventy-four thousand eight hundred sixty-two dollars and eighty-seven cents net to the said A. F. Churchill, and the assumption by the said Hanson of all debts and liabilities accrued or to accrue, absolute and contingent, growing

out of the purchase and operation of the said compresses and ginning plants. This money was to be paid by Hanson out of the proceeds of sale of said properties or otherwise, the business to be conducted in the name of the Churchill Compresses until the said considerations should be fully paid. That Hanson was to proceed with reasonable dispatch to dispose of said properties or a sufficient amount thereof to pay said indebtedness.

On the 11th day of June, 1920, said A. F. Churchill died testate. A copy of his will is made an exhibit to the bill, and said will devised to his wife all his property of every kind, and directed her to pay his debts, and relieved her from giving bond, filing reports or inventories, or getting permission of any court to sell any of his property or effects. This will was recorded in Lauderdale county, Miss., but no notice to creditors or any other proceeding taken, either in this state or in the state of Georgia, where the testator died, to present any claims for payment. After the death of said A. F. Churchill, Mrs. Lois Churchill, both individually and as executrix of the estate of said A. F. Churchill, executed and delivered an additional power of attorney to Hanson, which power was filed for record in Lauderdale county, Miss., November 12, 1920. In this instrument it was recited that there was a contract between A. F. Churchill and C. C. Hanson with reference to the sale of the property on the 2d day of June, 1919, by Churchill to Hanson. This instrument also recites that A. F. Churchill, after making said agreement, had given additional power of attorney dated June 19, 1919, for the purpose of enabling the same to be carried out according to its purpose. The instrument signed by Mrs. Lois Churchill recited that Hanson had paid approximately three hundred thousand dollars on the purchase of the property, and also that A. F. Churchill had left his property to said Mrs. Lois Churchill "absolutely, with full power to dispose of the same in any manner in which she might desire, etc., without obtaining any order of court whatsoever, and making any report to any court whatsoever." This con-

tract further recites that Mrs. Lois Churchill was desirous of carrying out the agreement between her husband and Hanson relative to the sale and disposition of all of the said compresses and ginning properties, and that it was deemed necessary, in view of the death of A. F. Churchill, for her to execute a power of attorney to the said Hanson to enable him to carry on the compressing and ginning business and to make sale and disposition of any of the property formerly owned by the said A. F. Churchill, in order to complete the execution of said contract between said A. F. Churchill and said C. C. Hanson, and to carry out the same in good faith.

The various contracts between the railroad company and the Churchill Compresses, made exhibits to the bill, are signed "A. F. Churchill, by C. C. Hanson," on the part of the compresses, and the contracts so signed were secured by the bond of the Fidelity & Deposit Company of Maryland, and the items sued for in the bill of complaint accrued while Hanson was conducting the business of the Church-hill Compresses either for Churchill or in his own right. under the contract between Churchill and himself. There was never any administration under the will of A. F. Churchill nor any notice published to creditors in any court in any state.

The bill was demurred to by Hanson, Morton, and the Fidelity & Deposit Company of Maryland, separately, but each filed the same grounds of demurrer and each was represented by the same counsel. The first ground of demurrer is that there is no equity on the face of the bill; the second that the original cause of action, if any, is against A. F. Churchill, deceased, and that the only way an indebtedness of this character can be collected is through an administrator or executor, and, third, that the executrix of said A. F. Churchill is an essential party to the suit. The bill made Mrs. Churchill a party as a non-resident defendant, but she was not made a party as the executrix of the last will of said A. F. Churchill.

The bill was filed upon the theory that C. C. Hanson was charged, under the contracts between him and A. F. Churchill, with the duty of paying the debts accrued and to accrue in the compress business, and that the creditor had a right to resort directly to a suit against Hanson. It was also filed on the theory that Mrs. Lois Churchill, being the sole devisee in the will and the executrix of the will, without bond, became a trustee for the payment of debts, and that the will constituted a trust to pay debts, and that she was responsible at least to the extent of the property devised to her for the payment of the debts, and that a creditor could resort to an action against her without probating any claim or taking any steps to have the estate administered. The will provides in the first item that all of the just debts shall be paid by the executrix. The second item gives to Mrs. Lois Churchill all of the estate and property of every character and description owned by the testator at his death to be her own property absolutely. The third item makes Mrs. Lois Churchill executrix of the will. The fourth item provides:

"I hereby give full authority to my executrix, Lois Churchill, full possession of all the estate of every character which I have or to which I may be entitled at the time of my death, and after taking out letters testamentary upon my estate, she shall thereafter be relieved from making any inventory, any appraisement, giving bond, making annual reports or conforming to any other legal provisions with reference to the administration of the estate of deceased persons, and the executrix under this will shall have absolute right to dispose of any property which may come into her possession, without obtaining any order from any court whatsoever. The intent hereof being to vest in the devisee taking under this will, the possession and enjoyment of my property after my death as quickly and as fully as possible, subject to the payment of indebtedness and without subsequent direction by any court."

Mrs. Lois Churchill made no appearance in the court below, and a decree *pro confesso* was taken against her,

and she is not a party to this appeal. The demurrer was overruled by the chancellor, and an appeal granted to settle the principles of the case.

We think that, under the contract between C. C. Hanson and A. F. Churchill, in his lifetime, and under the contract with Mrs. Lois Churchill individually and as executrix after his death, that Hanson is personally liable to the complainant, appellee, because he agreed in his contract to pay all the debts of the compress accrued and to accrue and was in charge of the compress properties, operating them, and that this right accrued to pay the debts as they became due, and were not deferred until after he had paid Churchill for the property in full.

This court held in *Barnes* v. *Jones*, 111 Miss. 337, 71 So. 573, that where the grantee, as a part of the consideration for a deed to him assumes the payment of the grantor's debt to his vendor, the grantee becomes personally liable to the creditor of his grantor who may recover the amount of the debt. In other words, in that case it was held that, when a contract is made by which the buyer of property agrees as a part of the purchase money therefor to pay the debt of the seller, that such a contract becomes an original contract between the buyer and the creditor of the grantor, and that such creditor may sue the grantee directly under the terms of the contract, though he is not a party to the contract. To the same effect is the case of *Dodge* v. *Cutrer*, 100 Miss. 647, 56 So. 455. Under these authorities we think the bill was maintainable against Hanson and that Hanson could not raise the question as to the propriety or legality of the proceeding against Mrs. Lois Churchill.

Inasmuch, however, as the chancellor has sent the case here to settle the principles applicable, we think that the will above referred to creates a trust for the payment of debts, and Mrs. Churchill, having, under the allegations of the bill, come into the possession of the property under the terms of the will, without publishing notice to creditors or taking any other steps to administer the estate,

would become personally liable to the creditors of A. F. Churchill at the time of his death, *Gordon* v. *McDougall,* 84 Miss. 715, 37 So. 298, 5 L. R. A. (N. S.) 355, and if she has, after the death of A. F. Churchill, had any connection with the operation of the compress bu.;iness, or, if she owned it while it was being operated by Hanson for her benefit, if he was so operating it, that she would become liable for the charges and expenses of such operation.

In our opinion the bill states a cause of action, and the chancellor was correct in overruling the demurrer.    Of course, when the answers are filed, any proper defenses, if any, to the bill may be raised, and cross-bills and answers between the defendants may be presented so as to raise all the questions affecting the rights of the parties.

*Affirmed and remanded.*